## DUNBAR v. INDUSTRIAL COMMISSION, et al.

No. 5705.　Decided December 30, 1936.　(63 P. [2d] 219.)

*P. G. Ellis,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

MOFFAT, Justice.

The plaintiff and applicant, Norman E. Dunbar, while engaged as a painter on a Federal Emergency Relief project at the State Fair Grounds in Salt Lake City, Utah, claims to have sustained an injury by accident on October 11, 1934, in the course of his employment. The manner in which it is alleged the accident and resulting injury occurred is as follows: Applicant was upon the roof of the auditorium building at the state fair grounds and in coming down and off a ladder from the main roof and in stepping off the ladder onto the slanting roof, at which time he was carrying two buckets of paint in his right hand, he twisted his ankle, lost his balance, and in trying to regain his balance and to keep from falling, twisted his back. At that moment he experienced

a pain along the spine that he could hardly stand. Another party saw the occurrence, but was not called to testify. As to the accident, the evidence of applicant is undisputed. There appears to be no unusual or impeaching or discrediting circumstances.

On October 27, 1934, the employer reported the accident to the Industrial Commission. The records indicate the employee lost no time until the 27th of October, the date of the report. His work was not continuous. There is a conflict in the evidence as to whether he worked the next day. He was then off for a number of days.

About October 26, 1934, applicant consulted Dr. Day, his physician. For some time the state insurance fund assumed liability and paid compensation and medical expenses. The commission made findings. In the findings there are some recitals as to what is alleged or claimed. In one of the findings the following is quoted as an allegation:

"That on October 11, 1934, while in the course of his employment as a painter, he suffered an accidental injury in the following manner: 'Was coming off ladder, and as I stepped off the ladder on to slanting roof with two buckets of paint in right hand, twisted ankle and lost balance, and in trying to keep from falling twisted my back.' It appears that applicant did not work the following day but, as work was available, he continued work off and on for about two weeks when a doctor was consulted."

Part of the foregoing quotation is a recital of allegation and part of it is a finding.

The finding then continues:

"The State Insurance Fund paid $320.00 in compensation beginning November 19, 1934, up to April 7, 1935, together with medical expenses in the sum of $135.00."

The finding then says:

"It is alleged by the applicant that he continues to suffer disability as a result of the alleged injury on October 11, 1934."

When the allegations are separated from the findings and compared with the evidence, two propositions are clear and

undisputed by the evidence. In fact, there is no other evidence on those matters. The applicant testified:

"* * * As I came down the ladder I had two buckets of paint, and [as] I put this foot down to get off the ladder, I twisted my ankle and lost my balance, to try to keep from falling and twisted my back. * * * Q. You are referring to the lower part of your back? A. Yes, right in there, right along the spine. Q. You experienced pain right at the moment? A. Yes, it caught me so I could not hardly stand at all."

That there was an accident arising out of and in the course of his employment and that there was a resulting injury is established without conflict or dispute by the evidence. There is no word or implication to the contrary, nor any suggestion, circumstances, or intimation that the evidence as to those matters should not be believed, given credit, and accepted at face value. That issue was conceded when the state insurance fund assumed liability and made payments covering the period indicated. This leaves the case to be determined upon the remaining question contained in the last sentence of finding No. II above quoted put interrogatively: Did the applicant continue to suffer disability as a result of the alleged injury of October 11, 1934, at the time of the hearing before the Industrial Commission?

No finding is made as to this question. Finding No. III says:

"The Commission finds that the applicant did not sustain an injury by accidental means on October 11, 1934, from which resulted the disability suffered or complained of by the applicant as herein alleged."

The first part of this finding has been disposed of by what has already been said. The commission in the last part of the finding says, "from which resulted the disability suffered." The quotation intimates that there was a resulting disability, but by intimation is contrary to the finding that the applicant did not sustain an injury by accident.

Referring again to the testimony, applicant testified:

"If I do anything my back tightens up in knots, with sharp shooting pains through my back and sometimes if I do anything those pains shoot through into my side, and my mouth gets full of sticky stuff."

He further testifed that when he gets up in the morning, "sometimes the pains are sharp, and at other times not as sharp as when I go to bed." He testified that before the accident occurred he had no trouble with his back.

In attempting to find a solution for his disability, applicant had consulted three physicians. Complying with their recommendations, he had his teeth and his tonsils removed. An appendectomy has been suggested.

The medical testimony establishes a muscular inflammation, technically termed myositis, resulting from an injury to the muscles and "probably kept up by infection," and that "until the infection is cleared up the disability will continue." Dr. Day, who so testified, further indicated, "I have every reason to believe that the man was injured * * * and the accident and injury have been aggravated and kept active by the toxic condition of the body."

Dr. Ossman, who examined the applicant some time later, among other things, said:

"I found no evidence of injury. His symptoms were on the opposite side from where he claimed he was hurt at the time. His complaint then was he had pain up under his ribs. The pain that he claimed at the time I saw him was the left lumbar muscles. I concluded he was suffering from lumbar myositis, an inflammation of the lumbar muscles, presumably caused by the injury."

Upon being further asked if there was any evidence of a psychic condition, Dr. Ossman replied, "Nothing grossly evidenced. He seemed to be intelligent. No motives disclosed for exaggerating his condition. The physical examination was essentially negative * * * There is no evidence of bone or joint injury."

Dr. Ossman, however, in his report stated, "Mr. Dunbar's symptoms, I believe, are due to muscle soreness only." He testified orally:

"A. November 20th, the day I examined him, I found no evidence of injury. His symptoms were on the opposite side from where he claimed he was hurt at that time. His complaint then was he had pain under the ribs. The pain that he claimed at the time I saw him was

the left lumbar muscles. I concluded he was suffering from lumbar myositis, and inflammation of the lumbar muscles, presumably caused by the injury.

"Q. Is it your theory that he injured his ligaments? A. There is no evidence of any injury when I saw him. I don't know whether he was injured.

"Q. But if he did have the injury, and let us assume he is telling the truth, where his foot slipped on the roof on the ladder and all of a sudden he loses his balance with two buckets of paint in his hand and he swerves his body to maintain his balance and from then on he has pain. Could that cause the condition? A. If he had an injury he would have an injury in the lower region where he stated it to be under the ribs, but later he had most of his pain on the opposite side and all through his back.

"Q. Would the injury be one of the aggravating causes? A. Not necessarily. An injury of that type alone should not lose any time. * * *

"Q. Might the alleged injury have been the exciting cause and the subsequent train of symptoms quite logical throughout? A. For infection, myositis?

"Q. As you see him? A. I don't think the injury alone would have lasted this length of time with that type of an injury."

Dr. Coray made a report in which he said, "There is no evidence of a bone lesion in the sacro-illiac joints, sacrum or lower lumbar vertebrae," and indicated that his type of injury "suggests muscle strain. They usually clear up in a very short time."

Dr. La Barge submitted a report and aside from a detailed report of a physical examination, it contains the following:

"The lumbar region and lower back are negative to visual examinations. The patient complains of some tenderness over both sacro-iliac regions and over the lower lumbar muscles on both sides, but particularly over the left lower lumbar region when bending forward or rotating the body to either side. He complained of some pain and stiffness in the same areas. In contradiction to these statements, however, he has a more than normal facility of motion in his back and bends forward sideways and backward with a marked ease which is in contrast to his statements concerning his back pain. There is no evident muscle spasm in his back and no pain in either kidney area on deep pressure. When asked to exercise upon either leg, he does not complain of any

hip pain or discomfort. In resume it is evident that the symptoms are largely subjective in character and the only objective findings is a complaint of tenderness over the lower lumbar muscles, particularly the left, and over the sacro-iliac joints on deep palpation. * * *

"Diagnosis: (a) Chronic bilateral sphenoid and ethmoid infection with right nasal polyp formation. (b) Bilateral lumbar myositis. (c) Traumatic neurosis with a definite question of purposeful malingering.

" (6) Summary and conclusions: A complaint of this type is difficult to evaluate on a correct and entirely fair basis. The exact pathology of back injuries of this type is still unascertained at the present time. It is common for employed individuals to complain of various types of back strains as a result of twists or exertion while engaged in a great variety of pursuits. It is also well recognized that such conditions may occur as a result of exposure to cold and inclement weather. It is also common to observe a considerable number of such cases during epidemics of acute upper respiratory infections, so it is quite possible that these conditions can occur as a result of acute infections and also as a result of exposure, without the problem of trauma entering into the case at all. These patients practically never have any elevation of temperature, nor do they show any leucocytosis, but it is well established clinical fact that such conditions may be very disabling as temporary factors and may recur repeatedly in susceptible individuals.

"Note: (continued) It has been my personal experience that the presence or absence of chronic infections has little if any relationship to the occurrence of these disabilities. The removal of the teeth and tonsils in this patient has had little effect upon the course of his complaints. I do not believe that his abdominal complaints have any relationship to any surgical pathology within the abdomen. If the theory of chronic infection is to be pursued further in this case, I believe it would be far more advisable to refer this patient to a competent rhinologist for treatment for his chronic sinus infection than to undertake abdominal surgery with the hope of relieving his symptoms. In view of the developments in the case of this patient to date, I am doubtful if a complete eradication of every possible focus of infection will be of any particular value as far as relieving of his symptoms is concerned. It is fair to point out that the incentive to recovery is definitely lacking in a case of this type. It is to the financial interest of the patient to stay disabled as long as possible, and it, as it is probable that his monthly income will be definitely greater under present circumstances if his disability continues than it will be if he recovers. I am inclined to believe that this patient would make a prompt symptomatic recovery if it were definitely to his financial interest to do so. This statement

does not imply that the patient is definitely a purposeful malingerer, but it is a well known medical-legal fact that patients suffering from subjective disabilities due to accidents will promptly recover in many instances as soon as the legal and financial aspects of the case are satisfactorily adjusted."

The record establishes an accident, a resulting injury, and a consequent disability for a time. A majority of the members of the court are of the opinion there is a conflict in the evidence as to whether or not the disability had been surgically or otherwise cured at the time of the hearing by the commission. On the question as to whether the applicant was industrially disabled at that time, the physicians did not commit themselves. Some of them indicated that a financial settlement would bring about "a prompt symptomatic recovery." The writer of this opinion has much difficulty in finding a conflict in the evidence on the question of industrial disability. In view of the closeness of the question, and in the interest of harmony, the writer graciously, though reluctantly, yields to the judgment of the majority of the court. The majority of the court is of the opinion that there is a conflict in the evidence and therefore the decision of the Industrial Commission may not be disturbed as a matter of law by this court, notwithstanding the applicant testified positively as to his disability and had manifested a willingness to follow and had followed the instructions and suggestions of the physicians with the exception of an appendectomy, and had indicated a willingness to submit to that. He had been co-operative.

Counsel for the Industrial Commission and the State Insurance Fund cite a number of cases, among which are the following: *Batchelor* v. *Industrial Commission,* 86 Utah 261, 42 P. (2d) 996. In that case the applicant claimed to be suffering from dermatitis and sore throat infection from breathing dust and other materials while engaged in cleaning up a room following work performed therein by an electrician. The commission found that the evidence did not show an accidental injury. The decision was sustained by

this court. A number of cases are there collected. The case of *Gagos* v. *Industrial Commission,* 87 Utah, 101, 48 P. (2d) 449, was a hernia case. The court held the commission in finding the facts was not always required to believe the uncontradicted evidence. In that case the court took the view that there were circumstances which tended to impeach or make the uncontradicted evidence susceptible of unbelief.

Let the order of the Industrial Commission denying compensation be affirmed. Such is the order.

ELIAS HANSEN, C. J., FOLLAND, and EPHRAIM HANSON, JJ., concur.

WOLFE, Justice (concurring).

I am of the opinion that the record clearly and without doubt discloses a case which does not meet with the tests laid down in *Norris* v. *Industrial Commission,* 90 Utah 256, 61 P. (2d) 413. We clearly cannot say on the record of this case that as a matter of law the commission came to a wrong conclusion from the evidence. I therefore concur in the order affirming the commission's order.